STATE of Oklahoma, ex rel. OKLA-
HOMA BAR ASSOCIATION,
Complainant,

v.

Virgil Scott ROWE, Jr. Respondent.

SCBD No. 3795.

Supreme Court of Oklahoma.

April 14, 1992.

John E. Douglas, Asst. Gen. Counsel Oklahoma Bar Ass'n, Oklahoma City, for complainant.

## ORDER

This matter is before the Court for consideration of complainant's application for an order approving the resignation of Virgil Scott Rowe, Jr. from membership in the Oklahoma Bar Association pending disciplinary proceedings. Upon consideration of the matter we find:

1. Respondent Virgil Scott Rowe, Jr. executed his resignation pending disciplinary proceedings on March 11, 1992;

2. Respondent's resignation was freely and voluntarily tendered, he was not subject to coercion or duress, and he was fully aware of the consequences of submitting his resignation;

3. Respondent was aware of a formal complaint against him issued by the Professional Responsibility Commission dated January 17, 1992 and filed in the Supreme Court of Oklahoma on February 7, 1992, styled State of Oklahoma, ex rel. Oklahoma Bar Association v. Virgil Scott Rowe, Jr., OBAD # 1039/SCBD # 3795. A copy of the complaint is attached to the resignation of respondent and a copy thereof is attached to the instant Order;

4. Respondent was also aware of presently pending investigations of allegations lodged in grievances with the Office of the General Counsel of the Oklahoma Bar Association that the following grounds for discipline exist:

a) DC 91–377, a grievance by Karen Beth Carpenter and opened for investigation on December 27, 1991, which concerns respondent's alleged neglect of a divorce case and his failure to communicate with his client. The client also alleged he filed the divorce case after she had attempted to discharge him and he would not return the file or fee. Further, that he failed to respond to the grievance despite notices to do so.

b) DC 91–383, a grievance by Kris K. Agrawal and opened for investigation on January 6, 1992, which concerns respondent's taking $600.00 to handle two cases, failing to appear in court and failing to communicate with his client despite several letters from the client to do so and despite a request from the Bar Association that he do so. Further, that he failed to respond in writing to the grievance despite notices to do so.

5. Respondent recognizes and agrees he may not make application for reinstatement to membership in the Oklahoma

Bar Association prior to the expiration of five years from the date of this order;

6. Respondent has agreed to comply with Rule 9.1 of the Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1-A, and he acknowledges he may be reinstated to practice law only upon compliance with the conditions and procedures prescribed by Rule 11 of the Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1-A;

7. The resignation pending disciplinary proceedings of respondent is in compliance with Rule 8.1 of the Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1-A;

8. Respondent's name and address appears on the official roster maintained by the Oklahoma Bar Association as follows: Virgil Scott Rowe, Jr., OBA # 12461, 224 W. Gray, Ste. 203, Norman, Oklahoma 73069;

9. Respondent's resignation should be approved.

It is therefore ORDERED complainant's application and respondent's resignation are approved.

It is further ORDERED respondent's name be stricken from the Roll of Attorneys and that he make no application for reinstatement to membership in the Oklahoma Bar Association prior to five years from the date of this order.

It is further ORDERED respondent comply with Rule 9.1 of the Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1-A.

It is further ORDERED respondent pay the costs of the Oklahoma Bar Association in regard to investigation of this matter in the amount of $850.82 within a reasonable time from the date of this order.

DONE BY ORDER OF THE SUPREME COURT.

OPALA, C.J., HODGES, V.C.J., and LAVENDER, SIMMS, HARGRAVE, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

ATTACHMENT

IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

State of Oklahoma ex rel.

Oklahoma Bar Association,

Complainant,

v.

Virgil Scott Rowe, Jr.

Respondent.

OBAD # 1039

SCBD # 3795

COMPLAINT

Feb. 7, 1992

Complainant, State of Oklahoma ex rel. Oklahoma Bar Association, for its claim against respondent, Virgil Scott Rowe, Jr., alleges and states:

1. Respondent is a member of the Oklahoma Bar Association and is licensed to practice law by the Supreme Court of the State of Oklahoma. Respondent was so licensed at all times relevant to this Complaint.

2. To the best knowledge, information and belief of Complainant, respondent has committed specific acts which constitute professional misconduct in violation of the Oklahoma Rules of Professional Conduct, 5 O.S. ch. 1, app. 3-A (Supp.1991), and are cause for professional discipline as provided in the Rules Governing Disciplinary Proceedings, 5 O.S. ch. 1, app. 1-A (1981). This standard of conduct, adopted and enforced by the Supreme Court of the State of Oklahoma, provides guidelines by which all attorneys are to practice law in Oklahoma.

3. These proceedings are begun pursuant to Rule 6, Rules Governing Disciplinary Proceedings ("RGDP").

4. The official Oklahoma Bar Association roster address of Respondent is: Virgil Scott Rowe, Jr., Attorney at Law, 224 W. Gray, Ste. 203, Norman, Oklahoma 73069.

## COUNT I

5. The respondent represented Norman Deal in an action against Deal for collection of past due child support brought by the Department of Human Services. The District Court of Carter County set for hearing a citation for contempt against Deal. At the hearing, Deal faced going to jail for contempt of court because he owed approximately $15,000 in child support arrearage.

6. Immediately prior in time, Deal was represented in a workers' compensation case by another lawyer. After settlement of the workers' compensation case in October of 1990, that lawyer gave Deal a check for $3,196.19, which was Deal's net cash settlement after payment of expenses and attorney's fees in the workers' compensation case. Deal delivered the check for $3,196.19 to respondent's office with instructions for respondent to deposit the check, withdraw $1,000 as fees, and hold the rest in trust for payment against the $15,000 child support arrearage.

7. On December 14, 1990, when respondent and Deal appeared before the court on Deal's hearing on contempt, the judge told Deal that he would have to either pay the entire $3,196.19 which he received from the workers' compensation case, or go to jail that day.

8. Respondent claimed he advised Deal that he had only $2,196 as he had spent the $1,000 which had gone to him as fees. Deal authorized respondent to write the $3,196 check with the promise that in a couple of days he or his wife would come up with the $1,000 difference. Therefore, respondent's check would be good by the time it was presented at his bank. Actually, as is more fully set forth below, respondent no longer had the $2,196 he claims.

9. Respondent wrote a check for $3,196.19 to the "DHS Child Support Enforcement" on his attorney at law account. The check was given to the Assistant District Attorney representing the Department of Human Services, Frank Baber. Baber caused the check to be deposited into the Department of Human Services account,

and paid the custodial parent in the case $3,196.19.

10. A few days later, respondent's check was returned to the district attorney's office as unpaid and marked "insufficient funds." Baber attempted to call respondent at his office number several times but his call was never returned. After the check was returned, Baber dialed respondent's number and got a "disconnected" recording.

11. On December 28, 1990, Baber tried the phone number again and respondent's secretary answered and stated he was out of the office and would be calling in for messages. Baber left a message informing respondent that Baber needed to talk to respondent about the check and for respondent to phone back that afternoon or by noon, January 2, 1991, at the latest.

12. At 10:30 a.m. on January 2, 1991, Baber again phoned respondent and was again told that respondent was out of the office but that Baber's message had been given to him.

13. On January 8, 1991, when Baber initially complained to the Oklahoma Bar Association, respondent still had not returned his call concerning the returned check.

14. Respondent paid the $3,196.19 to the Carter County District Attorney's Office on or about September 12, 1991, approximately nine months after presenting the worthless check, and only after the District Attorney filed an Application for Contempt Citation seeking to have the respondent found in contempt of the District Court of Carter County.

15. Respondent's conduct violates the mandatory provisions of Rule 1.3 and 8.4(c) and (d), Oklahoma Rules of Professional Conduct, and constitutes grounds for professional discipline.

## COUNT II

16. After Assistant District Attorney Baber contacted the Oklahoma Bar Association, the General Counsel wrote a letter to respondent and enclosed a copy of the grievance received from Baber. The Gen-

eral Counsel explained to respondent that because Baber's complaint appeared to concern a lack of communication regarding the insufficient check, the General Counsel's Office would not treat the letter as a formal grievance. Instead, the General Counsel requested respondent communicate, in writing, with Baber as soon as possible, but within two weeks of the date of the General Counsel's letter, about the matters set out in Baber's complaint. The General Counsel also asked respondent to send a copy of his correspondence with Baber to the General Counsel. The General Counsel also informed the respondent he felt that if respondent complied with the request, there would be no reason for the General Counsel's Office to conduct a formal investigation into the matter.

17. On March 13, 1991, Baber again wrote to the General Counsel informing the General Counsel that respondent had not contacted Baber and had not made any arrangements regarding the bad check he had given Baber's office.

18. On March 22, 1991, the General Counsel wrote to respondent and informed him that the General Counsel was initiating a formal investigation into the complaint made by Baber. The General Counsel informed respondent that its investigation would address, but not be limited to, alleged violations of Rules 1.3, 1.4, and 1.15. The General Counsel's Office also informed respondent of the requirement of Rule 5.2, Rules Governing Disciplinary Proceedings, that he provide a written response containing a full and fair disclosure of all the facts and circumstances pertaining to respondent's alleged misconduct within twenty days.

19. Respondent failed to respond, and on April 25, 1991, the General Counsel sent respondent a second letter informing him that if he did not respond within five days a subpoena would be issued for his appearance at the Oklahoma Bar Association.

20. When respondent still did not supply a response to the inquiry of the General Counsel, the General Counsel took steps to have a subpoena issued by the Professional Responsibility Commission. At the same time, the Bar Association's investigator assigned to the case attempted to contact respondent by telephone and on May 14, 1991, was finally successful in receiving a return call from respondent. The investigator informed respondent that the General Counsel's Office still had not received a response to the grievance, and respondent told the investigator that "this was a real screwed up mess." Respondent also told the investigator that he would have the matter resolved with Baber "by the end of the week." The investigator told respondent that he wanted a response to the grievance by the end of the week and respondent stated he would comply with that request.

21. On May 28, 1991, two weeks later, the General Counsel received a response from respondent, dated May 24, 1991. In that response, respondent explained the facts as set forth previously in Count I, including the fact that he decided to write a check for $3,196.19 to DHS, despite the fact that he had previously taken a $1,000 fee from the $3,196.19 fund which the Deals had given him. Respondent stated Deal was to have repaid him another $1,000 to cover the check, but that Deal was not in good health, was working only part-time, and had no way to pay him. Respondent stated he was not able to cover the difference in the amount of the check ($3,196.19) and the amount left over after he had taken his fee ($2,196.19) in time to prevent his check from being returned. Respondent stated "I have, at the time of this letter, been able to cover the check."

22. At the time of his May 24, 1991, letter, respondent had taken absolutely no actions to cover the check that he had written to the DHS, and his statement otherwise was totally false.

23. On June 21, 1991, the Bar's investigator telephoned respondent. The investigator asked respondent if respondent had gotten the matter with the check taken care of, and respondent told him he thought he had. Respondent then stated he sent a check to the DA's office in Ardmore "quite some time ago," but as of June

21, 1991, the check still had not cleared respondent's bank. Respondent stated he was not sure if the Carter County District Attorney's Office had received the check or not, and respondent did not know who was representing Deal. The investigator told respondent he would visit with Baber and if Baber had not received the check, the investigator would be back in contact with respondent.

24. The investigator contacted Baber on June 21, 1991. Baber informed the investigator that the check drawn on insufficient funds had still not been made good, and he had received no other check from respondent.

25. On July 23, 1991, Baber filed an Application for Contempt Citation against respondent in the *Deal v. Deal* action pending in the District Court of Carter County.

26. The District Court of Carter County set respondent's initial court appearance on the contempt citation the week of September 1, 1991. At his initial hearing, respondent represented to the court that he had enough money to pick up the check, and would do so on or before September 12, 1991.

27. On September 10, 1991, the General Counsel's Office took the deposition of respondent. During his deposition, respondent testified that when he received the $3,196.19 check from Deal, he deposited it to his attorney trust account and sometime later the $2,196 was "probably" transferred to his operating account and sometime subsequent to that he "probably" misappropriated some or all of Deal's $2,196. During his deposition, respondent further testified that the statement in his written response that he had been able to make the check good was not true. Respondent also admitted that he had not sent a check to Carter County to replace the first check.

28. During respondent's deposition, he promised to provide certain bank account records in order to allow the General Counsel to fully investigate this grievance. However, respondent failed to follow through with that agreement, and as a result, the General Counsel's Office subpoenaed copies of his trust account and operating account records.

29. A review of those bank records revealed that contrary to the testimony of respondent at his deposition when the $3,196 was paid to him, it was deposited directly to his operating account, not a trust account. Thereafter, there were numerous disbursements of that money for personal and business purposes. Those disbursements included house payments, car payments, telephone bills, office rent, and other expenses. The $3,196.19 was deposited into respondent's operating account on October 11, 1990, and by October 26, 1990, the account had a negative balance. On December 14, 1990, the day respondent wrote the $3,196.19 check to the "DHS Child Support Enforcement," his operating account had a negative balance of $4.75.

30. Respondent's conduct violated the mandatory provisions of Rule 5.2, Rules Governing Disciplinary Proceedings, and Rule 8.1(a) and (b), Oklahoma Rules of Professional Conduct, and constitutes grounds for professional discipline.

## COUNT III

31. Respondent borrowed money from Greg Vaughn. On January 9, 1990, respondent issued a $3,000 check to Vaughn, drawn on respondent's lawyer trust account, as partial repayment of the loan. This check was returned by respondent's bank for insufficient funds.

32. During the deposition taken of respondent concerning this matter, respondent testified that he wrote the $3,000 check on his trust account by mistake, having meant to write the check on his law office operating account.

33. When respondent's bank account records were later subpoenaed, a review of those records show that on the date respondent wrote the check to Vaughn, he had insufficient funds to cover the check in both his trust account and his operating account.

34. A review of those records also show that during the month of January of 1990,

respondent deposited approximately $7,000 in client funds to his trust account.

35. Respondent's conduct violated the mandatory provisions of Rules 1.15, 8.1(a), and 8.4(b) and (c), Oklahoma Rules of Professional Conduct, and constitutes grounds for professional discipline.

## COUNT IV

36. A grievance was received from Vaughn on July 2, 1991. On July 18, 1991, the General Counsel wrote respondent and informed him a formal investigation into this matter was initiated and of respondent's obligation under Rule 5.2 to provide a full and fair disclosure of all the facts and circumstances pertaining to respondent's alleged misconduct.

37. Respondent failed to respond, and on August 12, 1991, the General Counsel sent respondent a second letter informing him that if he did not respond within five days a subpoena would be issued for his appearance at the Oklahoma Bar Association.

38. Respondent still did not respond and the General Counsel took respondent's deposition on September 10, 1991, at the same time he was deposed concerning the Baber grievance.

39. During that deposition, the General Counsel requested respondent to provide relevant trust account records to further determine whether or not client funds had been in his trust account at the time the check was written in January of 1990. Again, respondent promised during the deposition to provide those records, but failed to follow through with the promise. The General Counsel was required to issue a subpoena from the Professional Responsibility Commission to the bank which kept respondent's trust account at that time.

40. Respondent's conduct violated the mandatory provisions of Rule 5.2, Rules Governing Disciplinary Proceedings, and Rule 8.1(b), Oklahoma Rules of Professional Conduct, and constitutes grounds for professional discipline.

WHEREFORE, premises considered, complainant, Oklahoma Bar Association, prays respondent, Virgil Scott Rowe, Jr., be disciplined as this Court finds equitable and proper, and for such other relief as this Court finds appropriate.

Done by the direction of the Professional Responsibility Commission this 17th day of January, 1992.

/s/ Michael D. Evans
Michael D. Evans, Chairman
Professional Responsibility Commission